UNITED STATES, Appellee

v

VICTOR T. ESTRADA, Private, U. S. Marine Corps, Appellant

7 USCMA 635, 23 CMR 99

No. 9191

Decided March 8, 1957

*Commander Earl C. Collins,* USN, argued the cause for Appellant, Accused. With him on the brief was *Captain Edwin H. Nichols,* USN.

*Major Verne L. Oliver,* USMC, argued the cause for Appellee, United States.

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused below, appellant here, was convicted by a special court-martial of larceny in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to be discharged from the service with a bad-conduct discharge, to forfeit $55.00 per month for four months, and to be confined at hard labor for a like period. The convening authority approved the findings and sentence but suspended the execution of the bad-conduct discharge until release from confinement or completion of appellate review, whichever occurred later. The officer exercising general court-martial jurisdiction approved the sentence. The board of review, one member concurring in the findings but dissenting from the majority's interpretation of the Fowle case (United States v Fowle, 7 USCMA 349, 22 CMR 139), affirmed the findings and the sentence as approved. The Judge Advocate General of the Navy submitted the case to this Court by certificate under the provisions of Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, for determination of three issues. The first question is whether under the circumstances of this case it was prejudicial error for the trial counsel to invite the court's attention to SECNAV Instruction 5815.2A. The second issue is whether the prejudice was cured by the cautionary part of the instruction to the effect that the court-martial members in each individual case shall have full discretion to take whatever action they deem will best serve the ends of justice. Since the board of review's decision must be reversed because of the injection of command control into the judicial process, it is unnecessary at this time to decide or discuss the third issue raised by the certificate.

In this special court-martial case, the accused pleaded guilty and no evidence was introduced. The trial counsel during the pre-sentencing stated:

"*The prosecution would like to invite the court's attention to SECNAV INSTR 5815.2A of 12 March 1956, which states the Department policy on offenses involving larceny and moral turpitude,* and further to the Manual for Courts-Martial, 1951, page 42, that portion of paragraph 33h which pertains to this type of an offense." [Emphasis supplied.]

There was no objection by the defense counsel and the trial counsel did not elaborate on the material referred to, or caution the court as to what effect it should have on their deliberations.[1]

---

[1]DEPARTMENT OF THE NAVY
Office of the Secretary
Washington 25, D. C.

SECNAV 5815.2A
Pers B732:FWB
12 March 1956

*SECNAV INSTRUCTION 5815.2A*
From: Secretary of the Navy
To: All Ships and Stations
Subj: Larceny and other offenses involving moral turpitude; policy concerning.

1. *Purpose.* To promulgate the policy and instructions of the Navy Department regarding persons convicted of larceny and other offenses involving moral turpitude.

2. *Cancellation.* SECNAV Instruction 5815.2 of 20 December 1954, same subject, is hereby canceled and superseded.

3. *Discussion*
a. As early as 1894, it was stated as a matter of policy that a convicted thief shall not be retained in the naval service. Each member of the Navy and Marine Corps must be able to rely on the honesty and integrity of his fellow members, as the protection of personal funds and property is difficult under living conditions aboard ship and in the field. There is also a peculiar element of trust involved where military and naval personnel have ready access to Government and organizational property, the safekeeping of which can

The truth that education demands reiteration is made clear by a comparison of the principles involved in the present case with those involved in the Fowle case, supra. As we stated in the case of United States v Littrice, 3

only depend upon the honesty and integrity of the members of the service.

b. The Manual for Courts-Martial not only reiterates the time honored policy on theft but also expresses similar requirements for other offenses involving moral turpitude. Paragraph 33h provides in part: ". . . the retention in the armed forces of thieves and persons guilty of moral turpitude injuriously reflects upon the good name of the military service and its self-respecting personnel."

c. There are various degrees of larceny and a distinction must be made between larceny and petty pilfering. The classic example of petty pilfering is the case where a man steals a small amount of food from the galley for his own immediate consumption. However, establishment of an arbitrary monetary value as the distinguishing feature between the two is inappropriate. A stolen wallet, for instance, might contain nothing or a large sum of money, yet the degree of larcenous intent of the offender be the same. A determination can be made only after considering all the circumstances of the offenses and by the exercise of mature judgment.

4. *Policy*

a. Cases of petty pilfering should be handled by nonjudicial punishment or referred for trial by an inferior court; more serious cases should be referred for trial before a general or special court-martial where a punitive discharge may be awarded. Convening authorities must see to it that they have sufficient information through administrative investigation, prior to referral of a case for trial, to enable them to make a proper determination.

b. Punishment awarded for larceny should depend upon the circumstances of the particular case. The foregoing is not intended to imply that the type of larceny referred to herein as petty pilfering is to be condoned. Petty pilfering should be charged as larceny in violation of Article 121, UCMJ, but the sentence therefor should not extend to a punitive discharge, except in aggravated cases or for repeated offenses. The determination of whether an accused has committed a theft to a degree warranting separation cannot be made from arbitrary rules as to monetary value since it is the intent of the offender, as distinguished from the value of the property, which indicates whether a punitive discharge is appropriate.

c. A person awarded a punitive discharge for larceny or any other offense involving moral turpitude will not ordinarily be restored to duty on probation. The possibility that an offender may again succumb to temptation should not be overlooked nor should the morale of the service be burdened with such potential.

d. Every case must be judged on its own individual merits. Accordingly, convening authorities, court-martial members, and reviewing authorities shall have full discretion to take such action or make such recommendations as they believe will best serve the ends of justice in the particular case.

5. *Action*

a. Commanding officers are directed to apprise members of their commands of the foregoing policy.

b. In reviewing court-martial cases where a punitive discharge has been awarded for larceny or other offense involving moral turpitude.

(1) the convening authority shall include in his formal action any facts tending to extenuate, mitigate, or aggravate the offense which do not appear in the court record or the papers accompanying same;

(2) where a plea of guilty has been entered by the accused, the convening authority shall include a synopsis of the circumstances of the offense in amplification of the statements set forth in the specification;

(3) a reviewing authority who suspends the punitive discharge for a probationary period shall include in his formal action a statement of the reasons therefor.

c. In complying with SECNAV Instruction 5810.6, clemency recommendations to the Secretary of the Navy relative to restoration to duty for a person convicted of larceny or any other offense involving moral turpitude shall clearly set forth the factors considered, and reasons for deviation from this policy.

ALBERT PRATT
Assistant Secretary of the Navy
(Personnel and Reserve Forces)

USCMA 487, 13 CMR 43: "It is one thing to announce a general policy and yet another to use that principle to influence the finding and a sentence in a particular case." We do not condemn general service policies and pronouncements. It is a commander's prerogative to determine such policies and to promulgate them as he sees fit. However, it is clearly not within a commander's prerogative to inject his policies into judicial proceedings. We thought we adequately expressed these views when we said in the Fowle case, supra:

"A policy directive may be promulgated to improve discipline; however, it must not be used as leverage to compel a certain result in the trial itself. In United States v Isbell, 3 USCMA 782, 14 CMR 200, we held that a circular which recited a policy respecting the undesirability of retaining thieves in the Army did not violate the law, but we did not hold expressly or impliedly that such a policy statement could be brought into the courtroom to influence the members of the court—irrespective of the particular merits of the case —to assess a punitive discharge. Although we are here faced with a secretary rather than a command directive, the former, emanating from the Secretary of a service, would be even more persuasive and bring more pressure to bear upon the members of the court than the latter type directive. Nor do we believe that once the trial counsel insists that the policy respecting a punitive discharge be 'implemented' with regard to an accused that the prejudice can be removed by the simple expedient of having the president or law officer remind the members of the court that they are not bound by the policy declaration. If everyone is presumed to know that as a general rule thieves should be separated from the service, why parade such information before the members of the court and then turn around and instruct them that they are not bound thereby, if the purpose is not to influence the court to adjudge a punitive discharge? It

was against this sort of command influence that the Code was initially directed. Reasonable men must conclude that once the Secretary of a service enters into the restricted arena of the courtroom, whether the members of the court are conscious thereof or not, he is bound to exert some influence over them. A trial must be kept free from substantial doubt with respect to fairness and impartiality. 'A judicial system operates effectively only with public confidence—and, naturally, that trust exists only if there also exists a belief that triers of fact act fairly.' United States v Stringer, 5 USCMA 122, 17 CMR 122. This appearance of impartiality cannot be maintained in a trial unless the members of the court are left unencumbered from powerful external influences."

Certainly the Congress announced its opposition to any such improper influences when it enacted Article 37 of the Uniform Code of Military Justice, 10 USC § 837, which provides in part:

". . . *No person subject to this chapter may* attempt to coerce or, by any unauthorized means, *influence the action of a court-martial or any other military tribunal* or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts." [Emphasis supplied.]

We also mentioned in Fowle, supra, and repeat here, that no cautionary instruction to members of the court that they may disregard the announced policies of their commander can relieve the error from prejudice. Each case is to be considered on the law and facts applicable to it alone and the policies of a particular commander have no place in the trial itself. The argument advanced by the majority of the board of review that the doctrine of the Fowle case applies only where it is suggested that such policy be implemented is distinguished by its lack

of insight into the ramifications of command influence. It is as unnecessary to suggest to the members of a court-martial that they *implement* a commander's policy, as it is futile to suggest that members of the court *disregard* the Secretary of the Navy's policy. There is only one reason that the commander's policies are brought to the attention of the court. That reason is to influence the members in their decisions of the case before it, and this is error to the prejudice of the accused. Reading or alluding to the Secretary of the Navy's instructions to the court is tantamount to calling him to the stand and asking what instructions he has with regard to the case before the court. No one familiar with the principles of the Anglo-Saxon jury system would suggest that this is permissible. The fact that the policy is stated in cautionary terms is of no consequence when applied to a particular case. Although the individual Secretary of the Navy instruction was not read to the court, it is obvious, as in the Fowle case, supra, that a reading was unnecessary because the members were aware of the policy contained therein, and when the instruction was brought to their attention, perceptive members of the court, in all probability, knew the command's desire that this accused should be separated from the service.

Accordingly, the board of review's decision is reversed and the record of trial is returned to The Judge Advocate General of the Navy for return to the convening authority for a rehearing on the sentence.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

In United States v Fowle, 7 USCMA 349, 22 CMR 139, a majority of the Court held that a policy pronouncement of the Secretary of the Navy, which forbade the retention of thieves in the Naval service, could not be brought to the attention of court-martial members at any time during the course of trial. I concurred in the result, being of the opinion that, absent any cau-

tionary instructions, the members might have believed that the policy directive was binding on them in fixing sentence. However, I clearly indicated that if the special court-martial president had instructed to the effect that the policy statement was to be used only as a guide, and that the court member's discretion was unfettered in determining sentence appropriateness, I would be unable to find prejudicial error in the proceeding.

The Secretary of the Navy Instruction 5815.2A, containing the questioned policy directive, has been substantially revised since the time of its inclusion in the Fowle record of trial. It still states that, as a general rule, thieves and other persons guilty of offenses involving moral turpitude should not be retained in the Naval service. However, it provides that the punishment awarded for larceny should depend upon the circumstances of the particular case, clearly implies that a punitive discharge is not usually appropriate for petty larceny, and goes on to say:

"d. Every case must be judged on its own individual merits. Accordingly, convening authorities, court-martial members, and reviewing authorities shall have full discretion to take such action or make such recommendations as they believe will best serve the ends of justice in the particular case."

It is true that no cautionary instructions were given here, and that the policy directive was brought to the attention of the members. However, by its very terms, the directive purported to be only a guide, and left the members free to exercise their discretion in the case. It is argued that, in all probability, the latter had some impact on the court but, if so, that is precisely what a policy letter is intended to accomplish. Certainly one would be naive to suppose that a well-publicized declaration would not be considered by a court-martial member and, absent some facts which would take a case out of the usual run of the mill convictions, that it would not exert some influence. There would be no point in the Secretary of a Department

adopting a policy if the pronouncement was expected to have no effect. But I take the view that discipline requires that policy decisions in certain areas of military justice be made by the echelons of higher command and that the Secretary of the Navy in this instance did not offend against Article 37 of the Code, 10 USC § 837, by issuing his directive, for that Article only proscribes influencing courts-martial by unauthorized means. Here the method used by the Secretary of the Navy and the principles enunciated by him have been accepted as proper for over 180 years, and the present Code does not directly, or by implication, make the promulgation of such policy regulations illegal. Furthermore, trial counsel did not violate any law or regulation, for the doctrine enunciated in the letter can properly be told to court-martial members. It is substantially a restatement of a policy declared by the President who has been authorized by Congress to make rules and regulations in the sentence field, even to the extent of fixing the maximum punishment for practically all offenses. Certainly it appears illogical to me to say the court may be told the limits of punishment as fixed by the Chief Executive, but it may not be informed of his general policies governing the imposition of sentences. I take the position that his may be referred to, and if so, then reference to those promulgated by the Secretary in this instance is not prohibited, for a mere reference to the Manual for Courts-Martial, United States, 1951, will disclose the similarity in the declarations of the two officials.

It is a matter of record that many civilian witnesses appeared before the House Armed Services Committee when it was holding hearings on the Uniform Code of Military Justice. For the most part they sought, without success, to convince Congress that the commander should be stripped of his authority to administer military justice within his command. However, Congress stopped far short of the civilian demands because of the close connection between military justice and military discipline, and apparently both House and Senate members were satisfied that a com-

mander should not be denied the right to inform court-martial members concerning many matters affecting military justice. True it is that they frowned on any unauthorized means of influencing court members, but those methods do not include mentioning to court-martial members the views of the Department as to what are regarded as appropriate sentences for designated classes of offenses. In that connection, it is worthy to note that Article 37 of the Code is merely a re-enactment of Article of War 88. The latter Article was enacted prior to 1949, and the framers of the Manual as of that date specifically authorized reference to sentence policy, for paragraph 87b of the Manual for Courts-Martial, U. S. Army, 1949, provides inter alia:

". . . Such instruction may also present the views of the Department of the Army as to what are regarded as appropriate sentences for designated classes of offenses."

That construction of Article of War 88 was notorious, and all Services published policy letters on the subject. In spite of the widespread knowledge of the policy and its probable effect on sentence, when Article 37 of the Code was proposed by the Code Committee and later enacted by Congress, it was couched in identical language with the predecessor article. Furthermore, those who prepared the Manual for Courts-Martial, United States, 1951, adopted the same construction, for the present Manual authorizes the commander to issue general instructions to court-martial members. Accordingly, as I have stated in previous opinions, I encounter no difficulty in concluding that an accused is not denied due process of military law merely because court-martial members were furnished information on sentence policies which should have been known by every member of the command.

One further factor which tends to substantiate my conclusion that court-martial members should be given information about sentence policies bears discussion. The state of discipline in a command is influenced for the better by speedy trials, appropriate punish-

640

ment for offenders, and orderly execution of sentences. Conversely, delayed trials, inadequate sentences, and long delayed enforcement of punishment have an adverse impact on good order. Therefore, a commander charged with maintaining discipline must have some latitude in advising his officers on deficiencies in the administration of military justice which need corrective action. Otherwise he cannot utilize one very effective agency for the maintenance of order. I do not accept the argument that the agency will oversentence if its members are kept informed. Many fine jurists have advanced the principle that a jury in a civilian system will reach a correct result if given all the facts touching on the matter in issue and informed correctly on the law. I believe that that principle can be used effectively in the post-finding procedure in military law. Particularly is it important that court-martial members be furnished with such information on sentence as will permit them to help keep justice and discipline in balance. One or the other must suffer unless all agencies charged with determining the appropriateness of sentence possess sufficient information to keep the scales in equipoise. Once a sentence is imposed, it can never thereafter be increased, and so it is important that due consideration be given by the court-martial to the desirability of imposing a punitive discharge as part of the original sentence. Assuming for the sake of argument that weight is given to the declared policies of the Secretaries of the Services, I know of no good reason why consideration should not be given to them. Those officials occupy positions which permit them a broader view of overall necessities of the service than can be gathered by court members. In addition, I doubt that they can justly be charged with seeking to continue improper command control over the court-martial system, and I believe it fair to say that they are interested in maintaining a well-disciplined fighting force without depriving an accused of any necessary rights. It is not that those at the top should fix sentence, it is merely that they should furnish some guides to keep the military departments at the maximum operational level and free them from those individuals who bring them into disrepute. An accused will not suffer from such a procedure, for if the members of the court-martial are completely informed about and instructed properly on the use of the guides available to them, a just sentence will result. Here they were informed of certain policy considerations, but most important of all is this, they were told that every case must be judged on the merits and that appropriateness of sentence was their sole responsibility. In my book that was a permissible instruction.

In this line of cases I have tried unsuccessfully to have the Court follow the Manual and permit commanders to circularize the troops, including court members, on certain aspects of military justice. It is apparent that my associates have taken the view that in the trial court instructions on or discussions about general policies are prohibited. Therefore, in conclusion, all I can say is that from this time on policy letters on military justice have little, if any, value to the service. Perhaps the best solution would be to discontinue their promulgation.